NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 17, 2026

S25A1404. SAMUELS v. THE STATE.

LAND, Justice.

Appellant Dyanta Derall Samuels challenges his 2022 convictions for malice murder and other crimes in connection with two separate incidents: the November 23, 2020 shooting death of Kareem Smalls and a June 20, 2020 shooting involving Jamie Delaney.[1] Samuels argues that there was insufficient evidence to

---

[1] On January 5, 2022, a Chatham County grand jury indicted Samuels for malice murder (Count 3), felony murder (Count 4), aggravated assault as to Delaney (Count 1), aggravated assault as to Smalls (Count 5), three counts of possession of a firearm during the commission of a felony (Counts 2, 6, and 7), and fleeing or attempting to elude a police officer (Count 8). This Court previously denied Samuels's application for interlocutory appeal.

At a trial from August 8 to August 19, 2022, the jury found Samuels guilty of all charges. The trial court sentenced Samuels to serve life in prison with the possibility of parole for Count 3, five years for Count 6 to be served consecutively to Count 3, ten years for Count 1 to be served consecutively to Count 6, five years for Count 2 to be served consecutively to Count 1, and one year for Count 8 to be served consecutively to Count 1. Count 4 (felony murder) was vacated by operation of law, Count 5 (aggravated assault) merged with

support his convictions, that the trial court erred in admitting evidence of his drug dealing, that the trial court plainly erred in admitting a detective's testimony regarding recorded jail phone calls, that his trial counsel was ineffective for failing to object to that testimony, and that these errors collectively prejudiced him. For the following reasons, we affirm.

1. Viewed in the light most favorable to the verdicts, the record shows as follows. On June 20, 2020, Delaney and her six-year-old daughter were driving in Chatham County when a silver Toyota Camry with dealer tags "almost T-boned" their vehicle. Delaney continued driving and the Toyota "zigzag[ged]" down the road before cutting her off and stopping at a stoplight in front of a convenience store. The driver of the Toyota, whom Delaney described as a man in his thirties or early forties, got out of his car and yelled while

Count 3, and Count 7 (possession of firearm during the commission of a felony) merged with Count 6. On August 22, 2022, Samuels filed a motion for new trial, which was amended by new counsel on March 14, 2025. After a hearing, the trial court denied the motion. On May 12, 2025, Samuels filed a notice of appeal. The case was docketed to this Court's August 2025 term and submitted for a decision on the briefs.

walking towards Delaney's car. Delaney began to drive around the Toyota, and the driver pulled out a gun from the Toyota and fired three shots at Delaney's car as she drove away. Delaney was uninjured. Surveillance footage from a nearby convenience store, which was played for the jury, shows the Toyota driver stop in the road, step out of the car, and motion towards the car behind him. The car behind the Toyota then drove around him. The driver of the Toyota then briefly reentered the Toyota and exited again, looked to his left, and shot at the other car as it drove away. The driver then got back into the Toyota and drove out of frame. Although no arrest was made, two shell casings were recovered from the scene.

Delaney did not know the driver of the Toyota. Approximately one year later, Delaney was shown a photographic lineup that included Samuels, but she did not identify any of the people in the lineup as the shooter. At trial, Delaney testified that Samuels was "not the shooter." However, Kelly Jeffers, who knew and interacted with Samuels, later identified the shooter in the video as Samuels. At trial, another associate of Samuels's, Samantha Hammack,

3

denied identifying Samuels as the man in the surveillance footage and testified that she only told investigators that "it could be" Samuels, who drove a "dark gray" Toyota Camry, not a "light gray" car. Body camera footage from Hammack's interview with investigators, which was played for the jury, indicated that Hammack told investigators that the man in the surveillance footage "look[ed] a lot like" Samuels and that she had seen him drive a car "that's very, very similar … a silver car like that."

Several months later, on the evening of November 23, 2020, Carita Scott was talking with Kareem Smalls outside of her apartment in the Kayton Homes area of Savannah. While Scott and Smalls talked, a red Dodge Charger with two occupants "circled" them "three or four times." Scott testified that, about 20 minutes after talking with Smalls, she heard a "couple of gunshots." Scott then saw a man wearing black clothing and black and yellow shoes come "running" from the direction of the gunshots. The man got into the passenger side of the "dark red" Charger that Scott had seen earlier, which "sped off" from the scene.

4

Grady Shaw and Frederick Kinlaw also witnessed the shooting. Shaw testified that he was standing on his porch and talking to Kinlaw, his neighbor across the street, when Smalls's van passed between them down the street. Shaw then "heard a commotion" that sounded like "somebody arguing" and saw the lights on Smalls's van turn on as a man approached the front of the van and shot into it. Kinlaw and Shaw then saw Smalls's van "fly up the street" and crash into a church van. Smalls got out of his van and "collapsed" in the street. Smalls died from his gunshot wounds. Kinlaw and Shaw also saw a "bright orange" or "burgundy" Dodge Charger leaving the area immediately after the shooting.

On November 24, an investigator with the Savannah Police Department identified a red Dodge Charger in the Kayton Homes area during the time of the Smalls shooting using surveillance cameras. The Charger, which had South Carolina tags, was identified as a vehicle owned by a car rental service. GPS records from the rental company placed the Charger arriving at the scene of the Smalls shooting at approximately 11:01 p.m. on November 23

5

and leaving the area six minutes later, less than one minute before police received a 911 call about the shooting. Investigators determined that the Charger was rented to James Harrell and his wife at the time of the shooting. Investigators went to the car rental location, where they observed Harrell return the Charger and leave the rental office with a red Chrysler 300. Harrell testified at trial that he would regularly rent vehicles for Samuels in his wife's name, that he returned the Charger and rented the Chrysler 300 for Samuels, and that he delivered the Chrysler 300 to Samuels.

That same day, Savannah police attempted a traffic stop on the Chrysler 300, which by that time had been delivered by Harrell to Samuels and had pulled into a gas station. When officers approached the Chrysler, Samuels "revv[ed] the engine real aggressively" and started to drive away. Believing that Samuels intended to flee, an officer broke the back windshield of the Chrysler with his nightstick to distract Samuels and to "mark" the vehicle for aerial surveillance. Samuels then led officers on an "extremely reckless" high-speed chase onto and off Interstate 16. After getting

6

stuck on a dirt road, Samuels abandoned the Chrysler, fled on foot, and hid in a nearby warehouse where he was eventually discovered and taken into custody.

During his custodial interview, which was played for the jury, Samuels told police that he was "high" when police approached him in the Chrysler, and that he fled because he thought police were shooting at him when the back windshield was broken. Samuels admitted that he possessed an "AR pistol" but claimed that he threw it onto the highway during the car chase. Samuels also admitted to driving a red Dodge Charger prior to the Chrysler and to being at Kayton Homes when Smalls was shot. Samuels claimed, however, that he was "smokin' weed" with an unidentified group of people for a "good 45 minutes" or "a good 20 to 15" minutes before Smalls was shot. When Samuels "heard some shots" he "got the f**k on" because he knew police were coming, but he did not remember how he left. Samuels stated that he "heard" that Smalls had been shot and killed that night.

A GBI expert witness testified that the shell casings recovered

from the Smalls shooting were fired from the same weapon as the shell casings recovered from the Delaney shooting, and that both sets of shell casings were fired from the same weapon, a Glock .45 Auto. During a search of Samuels's apartment, law enforcement found a box of .45-caliber ammunition and a gun box for a Glock 23 .40-caliber handgun, but no gun. A search of Samuels's cell phone also revealed photos of several Glock firearms of unknown caliber and a silver sedan with "similar features" and resembling the "same make and model" of the vehicle used in the Delaney shooting.

The State played for the jury several jail calls made by Samuels. During one of these calls, made prior to Samuels's arrest for Smalls's murder, Samuels directed his girlfriend to "go back" home "and pack up all my s**t."

2. Samuels argues that the evidence was insufficient to sustain his convictions as a matter of Georgia statutory law under OCGA § 24-14-6.[2] ("To warrant a conviction on circumstantial evidence, the

---

[2] We do not review sufficiency for Counts 4, 5 and 7 because those counts were either vacated by operation of law or merged. See *Anderson v. State*, 299

8

proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."). We disagree.

"Under Georgia statutory law, a conviction may rest solely on circumstantial evidence if that evidence 'exclude[s] every other reasonable hypothesis save that of the guilt of the accused.'" *Rashad v. State*, 318 Ga. 199, 206 (2024) (quoting OCGA § 24-14-6). "Not every hypothesis is a reasonable one, however, and the evidence need not exclude every conceivable inference or hypothesis – only those that are reasonable." Id. (cleaned up). "Further, whether any alternative hypotheses are reasonable and whether the circumstantial evidence excludes any such hypotheses are questions for the jury and we will not disturb the jury's findings on those questions unless they are insupportable as a matter of law." *Lee v. State*, S25A1002, slip op. at *3 (Ga. Dec. 9, 2025) (2025 WL 3520150)

Ga. 193, 196 n.4 (2016) (defendant's claims about sufficiency of evidence were moot for crimes that were vacated by operation of law or that merged with murder). Samuels does not challenge the sufficiency of the evidence as to Count 8.

(cleaned up). "And we have observed that such questions about the reasonableness of hypotheses that are for the jury to decide include the possibility of another perpetrator." Id. (cleaned up).

Turning first to the aggravated assault (Count 1) and possession of a firearm during the commission of a felony (Count 2) convictions in connection with the Delaney shooting, Samuels argues that the surveillance footage was "grainy," there was no cell-phone evidence tying Samuels to the location of the shooting, and Delaney denied that Samuels was the shooter. However, Jeffers admitted to identifying Samuels as the individual in the silver Toyota Camry on the surveillance footage of the Delaney shooting. And although Hammack denied identifying Samuels as the shooter at trial, she testified that she had seen Samuels drive a "dark gray" Toyota Camry. Despite Samuels's protests regarding Jeffers's and Hammack's testimony and Delaney's testimony that Samuels was not the shooter, "it is axiomatic that resolving evidentiary conflicts and assessing witness credibility are within the exclusive province of the jury." *McCoy v. State*, 315 Ga. 536, 543 (2023) (citation

10

omitted). Accordingly, the evidence was sufficient to support Samuels's convictions on Counts 1 and 2. See OCGA § 24-14-8 ("The testimony of a single witness is generally sufficient to establish a fact.").

Turning next to the malice murder (Count 3) and possession of a firearm during the commission of a felony (Count 6) convictions in connection with the Smalls shooting, Samuels argues that the evidence did not prove beyond a reasonable doubt that he shot and killed Smalls because it did not exclude the reasonable hypothesis that Samuels was merely present at Kayton Homes when Smalls was shot by someone else. Samuels highlights inconsistencies in the evidence, as well as evidence that was consistent with his alternative hypothesis. But as explained above, it is the jury's role to resolve evidentiary conflicts and assess witness credibility. See *McCoy*, 315 Ga. at 543. Moreover, Samuels's arguments about the State's failure to present certain types of evidence, including the gun used in the shooting, eyewitness testimony identifying him as the shooter, or a confession, are unavailing because "there is no

11

requirement that the State prove its case with any particular sort of evidence, so long as the evidence presented is competent." *Weston v. State*, 320 Ga. 472, 474 (2024) (citations and punctuation omitted).

Here, the jury heard testimony that GPS tracking data placed a red Dodge Charger that had been rented for Samuels at the scene during the shooting and leaving immediately thereafter. Samuels admitted he was present during the shooting and gave inconsistent answers as to how long he was present before the shooting took place. Scott testified that a red Charger circled her and Smalls several times shortly before the shooting and that an individual ran from the direction of the shooting and fled in a red Charger. Other eyewitnesses also saw a red or orange Charger leave the scene immediately following the shooting. An expert witness analyzed the shell casings collected from both the Delaney and Smalls shootings and determined that the firearm used in the Delaney shooting was the same firearm used in the Smalls shooting. At least one associate of Samuels identified him as the individual in the surveillance footage of the Delaney shooting, and a photo of a silver sedan with

similar features to the Toyota Camry was found on Samuels's cell phone. Ammunition was found at Samuels's apartment matching the caliber of bullet that killed Smalls, photos of multiple Glock firearms were found on Samuels's cell phone, and Samuels admitted to throwing a gun out of the window during his car chase. The evidence presented at trial therefore showed not only that Samuels was at the scene of the Smalls shooting, but also that he fled in a high-speed chase after the shooting, threw away a gun during the pursuit, and used the murder weapon in a prior shooting. Those indicia of guilt strongly suggest that Samuels was a perpetrator and not merely present. Accordingly, there was sufficient evidence from which the jury could reject as unreasonable Samuels's alternate theory that another individual shot Smalls and instead find beyond a reasonable doubt that Samuels shot and killed Smalls. See *Wilson v. State*, 319 Ga. 550, 553–54 (2024) (evidence sufficient to support defendant's murder conviction where defendant was in the vicinity of the shooting, he was seen driving car connected to shooting a few minutes before and a short distance away from the shooting, and a

shell casing found at the scene was ejected from the same firearm as a shell casing found in that car); *Payne v. State*, 273 Ga. 317, 318 (2001) (evidence sufficient to authorize rational trier of fact to find accused guilty beyond a reasonable doubt of murder and possession of a knife and to exclude every reasonable inference and hypothesis except guilt of accused, despite lack of any eyewitness testimony that defendant stabbed victim or that he possessed a knife). Therefore, this claim fails.

3. Samuels argues that the trial court abused its discretion in admitting evidence of his drug dealing activity. When this issue was argued in the trial court, the prosecutor stated that during a drug trafficking investigation of Samuels, law enforcement identified three people who knew Samuels and those people identified Samuels as the man on the video of the Delaney shooting. The prosecutor argued that those three people, Gilberto Hernandez, Hammack, and Jeffers, were connected to Samuels as "either drug purchasers from him or a drug supplier to him" and that "the fact that [Samuels] is involved in some level of drug transactions is relevant in this case

14

… and is the connection between these individuals and Mr. Samuels." Samuels argued that "[d]rug trafficking is not relevant in this case" and that evidence of Samuels's drug activity was not intrinsic and was instead a way to "simply to get in the trafficking." The trial court found that because the witnesses were "coming in here to identify Mr. Samuels in connection with the first incident, the first shooting, which is connected to the second shooting by the ballistics evidence," the testimony that Samuels's "relationship to these folks might involve drugs" was "intrinsic to this case" as the "only means the State has to identify Mr. Samuels in their theory of the case." The trial court further found that "[OCGA § 24-4-]403 doesn't keep it out either" because while the evidence "is certainly prejudicial to Mr. Samuels … it is not unfairly prejudicial to the point that it outweighs the probative value."

During opening statements, the prosecutor stated that the video of the Delaney shooting "was shown to two individuals known to purchase narcotics from the Defendant." Outside the presence of the jury, Samuels moved for a mistrial, arguing that as a result of

15

the statement, Samuels "no longer has the presumption of innocence. Now he's a drug dealer sitting at the table accused of [m]urder." The trial court denied the motion for mistrial, stating that "the way the witnesses who identified [Samuels] in the video know him to be able to identify him is intrinsic to … the case" and is "being admitted to tell the story of how's he's identified … in these cases." The jury returned to the courtroom and opening statements resumed, with the State noting that the witnesses "know [Samuels] because they purchase narcotics from him" but that "this is not a drug trial. This is a trial about [m]urder and how they connect those two individuals."

During trial, Hernandez testified that he met Samuels in early 2021, and that he met with Samuels "once or twice a day" over eight months to "buy[] stuff from him." The prosecutor then asked, "What did you buy from him?" and Samuels's trial counsel objected. Before the trial court could rule on the objection, Hernandez answered "Just a couple of pills. And that's it." Samuels moved to strike Hernandez's answer. The trial court denied Samuels's motion,

16

stating that it would let the testimony in "to allow the State to attempt to prove the nature and closeness of the relationship." Later in his testimony, Hernandez denied ever telling investigators that the individual in the surveillance footage of the Delaney shooting looked like Samuels. Jeffers testified that she knew Samuels by the name "Black." When the prosecutor asked Jeffers about the nature of her relationship with Samuels, Jeffers testified that she "sold him drugs … [a]t least twice a month" for a year. Hammack was not asked and did not provide any detail about the nature of her and Samuels's relationship.

Samuels argues that the evidence of his alleged drug dealing activity was inadmissible as intrinsic evidence because it was not linked to the charged crimes.[3] "It is within the trial court's sound discretion to determine whether to admit such evidence, so we review a trial court's ruling admitting evidence as intrinsic for an abuse of that discretion." *Harris v. State*, 310 Ga. 372, 377–78 (2020)

___

[3] Whether this evidence could have been properly admitted under OCGA § 24-4-404(b) is not at issue in this case, and the State does not contend that it gave the notice required for Rule 404(b) evidence.

(cleaned up). Even if a trial court does abuse its discretion in admitting evidence, that error warrants reversal "only if it was harmful." *Jivens v. State*, 317 Ga. 859, 863 (2023). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." Id. (cleaned up). In considering whether a trial court's error was harmful, "we weigh the evidence as we would expect reasonable jurors to have done so, as opposed to assuming that they took the most pro-guilt possible view of every bit of evidence in the case." *Boothe v. State*, 293 Ga. 285, 289 (2013).

Here, even assuming that the trial court abused its discretion in admitting evidence of Samuels's alleged drug dealing activity as intrinsic, it is highly probable that any such error did not contribute to the verdict. As detailed in Division 2, the circumstantial evidence properly admitted against Samuels was strong, and although Samuels's alleged drug activity was "certainly not helpful" to his case, the details "were not unusually inflammatory." See *Roberts v. State*, 315 Ga. 229, 239 (2022) (concluding that "the evidence that

was properly admitted against Roberts, although circumstantial, was quite strong," such that "it was highly probable" that the improperly admitted "extra details of the armed robbery did not contribute to the verdicts"). And although Samuels argues in his brief that the evidence of his alleged drug activity was harmful because the State emphasized it in opening statements and closing arguments,[4] the State lessened any harm in opening statements by clarifying to the jury that "this is not a drug trial. This is a trial about [m]urder and how they connect those two individuals." Cf. *Floyd v. State*, 321 Ga. 717, 726 (2025) (concluding that any error in admitting gang-related evidence was harmless where witness "immediately clarified his statement"). As for closing arguments, the prosecutor's statement that Samuels called Jeffers "a snitch" and "[l]iken[ed] her to a man who was murdered for talking" made no

---

[4] Samuels also points to the State's explanation of a jail phone call where he referred to Jeffers as the "New Jack City" movie character "Nino Brown" as evidence of harm. These references to "Nino Brown," however, were made by the prosecutor during a sidebar conference over whether to admit these jail phone calls and were not made in the presence of the jury. When Detective Patrick Skinner was later asked, in the presence of the jury, to explain why Samuels had referred to Jeffers as "Nino Brown," he made no reference to drug activity.

19

reference to Samuels's drug activity, only Jeffers's. Under these circumstances, we conclude that it is highly probable that any erroneously admitted evidence of Samuels's drug activity did not contribute to the jury's verdict. See *Jackson v. State*, 306 Ga. 69, 80–81 (2019) (concluding that harm from the erroneous admission of defendant's prior bad act was minimal because, among other reasons, the record failed to show that the prosecutor emphasized that evidence in his closing argument).

4. Samuels argues that the trial court plainly erred in admitting Detective Patrick Skinner's commentary on Samuels's jail phone calls because it was cumulative of Samuels's own statements on the recordings, it was not relevant, and it was lay witness opinion testimony that did not satisfy OCGA § 24-7-701(a). Samuels also argues that his trial counsel was ineffective for failing to object to Detective Skinner's testimony.

Detective Skinner testified that, as part of his investigation, he reviewed recorded jail communications made by Samuels. During Detective Skinner's direct testimony, the State played a series of jail

calls between Samuels and others in which the Smalls shooting was discussed. In one call, Samuels's girlfriend told him that "they" were trying to "charge" Samuels with "[w]hatever happened in November" and that "it's on the news." In response, Samuels asked his girlfriend whether "[t]hey have my face on there." Later in the phone call, Samuels's girlfriend added in another caller named "J-man," and Samuels told him, "I need a lawyer." After "J-man" left the call, Samuels asked his girlfriend to read "everything they're saying" on the news. When asked whether Samuels "ever den[ied] committing the murder when he is told he's being charged with it" on the jail phone call, Detective Skinner testified "no."

The State later played another jail call between Samuels and a male caller about Samuels's conversation with his girlfriend and the new charges. When asked whether Samuels denied killing Smalls during the call, Detective Skinner testified "[n]o, he does not."

The State then played a jail phone call between Samuels and a male caller in which the caller told Samuels there was a video of him

21

"dumping out" at "516 Veteran's, Westlake ... [b]y a store in the corner." Samuels responded "[t]hem folks got me on some bulls**t, Bruh." Detective Skinner testified that at the time of this call, investigators were showing people the surveillance video of the Delaney shooting and that the term "dumping" refers to "shoot[ing] a bunch of rounds, or at least one round." When asked whether Samuels indicated "that he was not dumping at any point," Detective Skinner answered "no." The State also played a phone call between Samuels, his girlfriend, and Samuels's attorney, in which the attorney read Samuels the charges from his indictment and Samuels responded "Now I got an Aggravated Assault from June 20th? I never was arrested for ... that." When asked whether Samuels stated on that call that he did not commit aggravated assault against Delaney, Detective Skinner stated "no."

On cross-examination, Detective Skinner testified that the calls were "evidence that [Samuels] didn't deny" the Delaney shooting at the time, and that Samuels's lack of denial was "notable." When asked whether Samuels's lack of denial was

22

"evidence that … he's involved in Mr. Kareem Smalls' killing?" Detective Skinner answered, "It's been submitted as, yes." When asked again whether one of the phone calls was evidence that Samuels committed the Smalls or Delaney shooting, Detective Skinner stated "I can't testify to what it's evidence to. They asked me what the phone calls were."

(a) Samuels argues that the trial court erred in admitting Detective Patrick Skinner's commentary on Samuels's jail phone calls because it was cumulative of Samuels's own statements on the recordings, it was not relevant, and it was lay witness opinion testimony that did not satisfy OCGA § 24-7-701(a).[5] Because Samuels did not object to Detective Skinner's testimony concerning his failure to deny the Delaney shooting during the jail calls, we

[5] OCGA § 24-7-701 (a) provides that:
(a) If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences shall be limited to those opinions or inferences which are:
    (1) Rationally based on the perception of the witness;
    (2) Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and
    (3) Not based on scientific, technical, or other specialized knowledge within the scope of Code Section 24-7-702.

23

review this claim for plain error only. *McCalop v. State*, 316 Ga. 363, 375 (2023). To establish plain error, Samuels must meet each prong of a four-prong test:

> First, there must be an error or defect – some sort of deviation from a legal rule – that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error – discretion which ought to be exercised only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Washington v. State*, 312 Ga. 495, 498 (2021) (citation and punctuation omitted). "As we have noted, affirmatively establishing all four prongs is a difficult standard to satisfy." Id. at 498–99 (citation and punctuation omitted). "This Court does not have to analyze all elements of the plain-error test where an appellant fails to establish one of them." *Payne v. State,* 314 Ga. 322, 325 (2022).

Assuming without deciding that the trial court obviously erred

in allowing Detective Skinner to testify about the content of Samuels's jail phone calls, Samuels has not shown plain error because he cannot satisfy the third prong of the plain error test. See *Grier v. State*, 313 Ga. 236, 245 (2022) ("Appellant has not met his burden under the plain error standard to show a reasonable probability that the outcome would have been different, as the improperly admitted [testimony] was merely duplicative of other properly admitted evidence.").

As an initial matter, Samuels mischaracterizes Detective Skinner's testimony, arguing that Detective Skinner testified that Samuels's lack of denial was "evidence … he's involved in Mr. Kareem Smalls's killing" and "that he committed the shooting … at Ms. Jamie Delaney." Our review of the trial transcript indicates that when Detective Skinner was asked whether Samuels's lack of denial was "evidence that … he's involved in Mr. Kareem Smalls' killing?" Skinner answered, "It's been submitted as, yes." When Detective Skinner was asked whether Samuels's lack of denial was evidence "that he committed the shooting of … Delaney?" Skinner answered,

25

"I don't think that was mentioned in this phone call … I can't testify to what it's evidence to. They asked me what the phone calls were." Thus, Detective Skinner did not, as Samuels argues, "repeatedly testify that because Samuels did not explicitly state, 'I didn't do this,' he was guilty." Moreover, this specific testimony about whether the non-denials were evidence of Samuels's guilt was elicited by Samuels on cross-examination, not by the State on direct.

In any event, Samuels does not argue on appeal that the jail phone calls themselves were inadmissible, only that the trial court plainly erred in allowing Detective Skinner to testify regarding Samuels's lack of denial in the phone calls. Thus, the jury heard Samuels's non-denials on the phone calls for themselves. Detective Skinner's testimony recounting the fact that Samuels did not deny shooting at Smalls or Delaney was therefore cumulative of Samuels's statements in the jail phone calls. See *Durden v. State*, 318 Ga. 729, 733–34 (2024) (holding that any error in the admission of a detective's lay opinion testimony about the appellant did not affect the appellant's substantial rights under the plain error

26

standard where the testimony was cumulative of other unobjected-to testimony). Additionally, the trial court instructed the jury that the "burden of proof never shifts to the Defendant to introduce evidence or to prove innocence," and jurors are presumed to follow a trial court's instructions. Cf. *Wilson v. State*, 315 Ga. 728, 735 (2023) (jury was presumed to follow court's instruction regarding proximate cause when determining whether defendant was guilty of felony murder). Samuels's claim of plain error therefore fails. See *Durden*, 318 Ga. at 733–34.

(b) Samuels also argues that his trial counsel provided constitutionally ineffective assistance by not objecting to Detective Skinner's testimony. To prevail on this claim, Samuels must show that he was prejudiced by his counsel's deficient performance. See *Strickland v. Washington*, 466 US 668, 687 (1984). As set forth above, however, Samuels has not shown that Detective Skinner's testimony affected the outcome of the trial. Accordingly, even if trial counsel's failure to object was deficient performance, Samuels has not shown that he was prejudiced as a result. Thus, this claim fails

27

for the same reason his claim of plain error fails. See *Griffin v. State,* 311 Ga. 579, 584 (2021) ("[T]he test for prejudice in the ineffective assistance analysis is equivalent to the test for harm in plain error review." (citation omitted)).

5. Samuels argues that he was cumulatively harmed by the trial court's errors. This claim fails.

"When this Court has identified or presumed more than one error, although the effect of each on its own might have been harmless," we will "consider collectively, rather than individually, the prejudicial effect, if any, of [the] trial court errors." *Nundra v. State*, 316 Ga. 1, 16 (2023) (citation and punctuation omitted). Even considering the assumed error in permitting witness testimony regarding Samuels's drug activity and Detective Skinner's testimony regarding Samuels's statements in jail phone calls, we conclude that the cumulative effect of these errors does not warrant a new trial. See *Allen v. State*, 310 Ga. 411, 417 (2020) (holding that the cumulative effect of the trial court's assumed errors did not warrant a new trial given the "strong evidence" against defendant).

28

As noted above, the State did not emphasize Samuels's alleged drug activity in opening statements or closing arguments, and Detective Skinner's testimony was cumulative of other unobjected-to testimony. In light of the other substantial evidence of Samuels's guilt heard by the jury in this case, we conclude that Samuels has not shown that "the multiple errors so infected the jury's deliberation that they denied" him "a fundamentally fair trial." *Greene v. State*, 316 Ga. 584, 608 (2023) (quotation marks omitted). See also *Huff v. State*, 315 Ga. 558, 568 (2023) (holding that the appellant's cumulative-error claim failed because the appellant did not demonstrate that "the prejudicial effect of the assumed trial court errors ... denied him a fundamentally fair trial, given the strong evidence against him"). Accordingly, Samuels's cumulative-error contention fails.

*Judgment affirmed. All the Justices concur.*