NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: December 20, 2022

S22A1040. CAVISTON v. THE STATE.

ELLINGTON, Justice.

A Richmond County jury found Robert Caviston guilty of malice murder and arson in the first degree in connection with the death of his 92-year-old mother, Agnes Caviston.[1] Caviston contends the trial court erred in denying his motion for a new trial on the general grounds. He also argues that the trial court erred in admitting harmful evidence of a fantasy novel that he had written,

---

[1] On February 10, 2015, a Richmond County grand jury indicted Caviston for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), and arson in the first degree (Count 3). At a trial that began on January 8, 2018, the jury found Caviston guilty on all counts. The trial court sentenced Caviston to life in prison without parole for malice murder and to a consecutive 20-year prison term for arson. The trial court merged the felony murder count with the malice murder count for purposes of sentencing, although that count was actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). Caviston timely filed a motion for a new trial on February 2, 2018, and amended it on October 19, 2021. After a hearing, a successor judge denied the motion on January 25, 2022. Caviston timely filed a notice of appeal. His appeal was docketed to the August 2022 term of this Court and submitted for a decision on the briefs.

titled "The Philosophy of Murder," thus requiring a new trial. Because Caviston has failed to show reversible error, we affirm.

The evidence submitted at trial shows the following.[2] On November 15, 2014, a witness saw a naked man sitting in the middle of the street in front of 2717 Wicklow Drive in Augusta. She noticed that the man's house was on fire and asked him whether he had called 911. The man, later identified as Caviston, told her that he had just killed his mother and would not call 911. The witness immediately called 911.

A sheriff's deputy responding to the 911 call found Caviston lying naked on the ground in his neighbor's yard, as if he were "sunbathing." Caviston's neighbor testified that he watched the

_____

[2] In this case, Caviston has raised claims of non-constitutional error only; consequently, we review the evidence de novo instead of in the light most favorable to the jury's verdicts. "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (Citation and punctuation omitted.) *Kirby v. State*, 304 Ga. 472, 478 (819 SE2d 468) (2018). It is the State's burden to show harmlessness. *Bozzie v. State*, 302 Ga. 704, 708 (808 SE2d 671) (2017). In deciding whether the State has met its burden, "we weigh the evidence as we would expect reasonable jurors to have done so, as opposed to assuming that they took the most pro-guilt possible view of every bit of evidence in the case." (Citations omitted.) *Boothe v. State*, 293 Ga. 285, 289 (745 SE2d 594) (2013).

deputy approach Caviston and heard the deputy ask if anyone was still in his house, to which Caviston responded, "Yeah, my mom, I just f-ing bashed her head in." Caviston told the deputy that he might have killed his mother and set the house on fire. The deputy handcuffed Caviston, covered him with a blanket, and took him to a patrol car. As the deputy put Caviston in the patrol car, another deputy heard Caviston say: "How can you not feel anything after you kill your mother? I just smashed her skull in." Caviston also told a responding paramedic that his mother was in the burning house and that he had just killed her. He added that he was tired of taking care of his mother and that, "I'm an animal, everyone's an animal, my mother is an animal – well, she was," and then he laughed. On the way to the Richmond County Jail, Caviston told a deputy that "everyone wanted [his mother] dead" and "they all got what they wanted." When he arrived at the jail, Caviston said: "[I]t looks like maximum security," and then commented: "I must have killed my mother."

While the deputies took Caviston into custody, first responders

broke through the locked front door of the burning house. Firefighters encountered one fire burning in the front doorway and another in the living room. After putting the fires out, a firefighter found Agnes Caviston's burned body in the living room beneath a pile of charred clothing, books, and papers. A firefighter testified that the victim's head had been split open and that brain matter was visible.

An arson investigator testified that fires were set in two separate places in the house. Once ignited, the fires burned quickly; they did not smolder. The house was mostly empty, and the "only things in the house that were burned were piled around this victim; papers, books, all kind of stuff just piled around the victim." Many of the books were books about philosophy. The investigator noted that a Bible and some flowers had been placed next to the victim. There was no power at the property, so the investigator ruled out an electrical malfunction as the cause of the fire. He also ruled out the possibility that the fire originated in the fireplace because only heat and smoke (as opposed to fire) damage was visible in the one room

4

with a fireplace. The investigator saw nothing that would have sparked a fire. Based on the evidence, the investigator concluded that the fires were caused "by human intervention" and were intentionally set.

An expert in blood-splatter analysis testified that he collected a jacket from the dining room that appeared to have blood on it. He described the blood on the jacket as "medium velocity" bloodstains, meaning the "blood was moving through air and made contact with something." In his expert opinion, medium velocity bloodstains on the jacket would be consistent with blood splatter resulting from someone bludgeoning the victim's head.

An investigator found a broken IV stand in the house. It had blood and human hair on it. He took swabs from the IV stand, which were sent to the GBI for testing. The tests confirmed that the blood on the IV stand was the victim's. The blood pattern on the IV stand was consistent with it being used as a bludgeon. The blood splatter pattern on the floor around the IV stand was also consistent with it being used to repeatedly strike the victim's head.

The forensic pathologist who conducted the autopsy testified that the victim had "extensive and severe head injuries." He estimated at least seven or eight blows to the victim's head and opined that it "would take a very large amount of force to cause this injury, as evidenced by the amount of fracturing of the skull and then the presence of the stretch-tear lacerations on the face." The pathologist also noted that the victim had neck injuries consistent with both blunt force trauma and strangulation. The victim also had abrasions on her shoulder, a fractured left upper arm, fractures to four upper ribs, and a fractured sternum. All of those injuries appeared to be recent and likely occurred at the same time as the head trauma. There was no evidence of smoke inhalation. Based on the autopsy, the pathologist determined the victim's cause of death was traumatic head injury, and the manner of death was homicide.

Caviston's daughter testified that the victim was 92 years old, bed-bound, had a feeding tube, and required around-the-clock care. Caviston was the victim's caretaker. On the day of the fire, Caviston called his daughter and said that he had to move out of the home by

6:00 that evening, because he was being evicted. The daughter testified that Caviston wanted to move to Hollywood, start a singing career, and meet the actress, Kristen Stewart. A friend of Caviston testified that Caviston was "completely over the situation" of taking care of his mother and "wanted his freedom back." He expressed a desire to go to California.

Caviston testified at trial that he killed his mother in a "freak accident." He claimed that he heard his mother scream and saw a "little smoke" by her hand. As he ran to her, he tripped on something and went "flying through the air," landing on top of her. Rubbing alcohol "squirted" out of the bottle he was holding onto a burning ember and started a fire. He looked up and saw that the base of the IV stand had impaled his mother's head, breaking her skull open. He started screaming and tried to get up, but he fell on his mother over and over again, with the IV stand still under his arm. Caviston also testified that, when he told people that he had killed his mother, he did not mean that he had murdered her. He explained:

I did bash her head in and that's what I told everybody. .

. . I didn't mean I murdered my mom. You know if I had only been able to think properly and maybe said the words, by accident, I wouldn't be here today. But the traumatized mind doesn't think like that, and the images, the images, the image of my mom dead just overwhelmed me.

On cross-examination, the State asked Caviston if he had written a book titled "The Philosophy of Murder." Caviston responded that he had and that it was one of three books he had published. He said the novel had "a haunted mansion and a ghost in it" and that it was "a love story." He explained that the serial killer subplot was just a device to put the protagonists "under intense pressure to see where they could go in a stressful situation." When asked if he was romanticizing murder, Caviston said "no." When asked if he was good at telling stories, Caviston responded: "Not as good as you, but yes, I am." The prosecutor asked no further questions about the novel.

1. Caviston contends that the trial court erred in denying his motion for a new trial on the general grounds pursuant to OCGA §§ 5-5-20 and 5-5-21 because "irrelevant and highly prejudicial

8

evidence of a book that Caviston had written ten years prior under the pseudonym Bob Johnsson, titled The Philosophy of Murder[, was admitted at trial.]" He argues that the admission of this evidence was prejudicial and improperly "biased the jury against [him] and tainted all the State's evidence in the trial." Moreover, he contends that the trial court failed to exercise its discretion by weighing the evidence and considering the credibility of the witnesses and, instead, reviewed his general grounds claim under the constitutional sufficiency standard of *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). For the reasons that follow, this claim of error is without merit.

"A trial court reviewing a motion for new trial based on [the general] grounds has a duty to exercise its discretion and weigh the evidence and consider the credibility of the witnesses." *Choisnet v. State*, 292 Ga. 860, 861 (742 SE2d 476) (2013).

> Even when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is "contrary to . . . the principles of justice and equity," OCGA § 5-5-20, or if the verdict is "decidedly and strongly against the weight of the

9

evidence." OCGA § 5-5-21. When properly raised in a timely motion, these grounds for a new trial – commonly known as the "general grounds" – require the trial judge to exercise a broad discretion to sit as a "thirteenth juror."

(Citation and punctuation omitted.) *White v. State*, 293 Ga. 523, 524 (2) (753 SE2d 115) (2013). If the trial court performs this duty, then a thirteenth juror argument "is not properly addressed to this Court as such a decision is one that is solely within the discretion of the trial court." (Citation omitted.) *Smith v. State*, 300 Ga. 532, 534 (796 SE2d 671) (2017). "[W]here, as in this case, the judge who hears the motion for a new trial is not the same judge as the one who presided over the original trial, the discretion of the successor judge is narrower in scope." *State v. Harris*, 292 Ga. 92, 95 (734 SE2d 357) (2012). However, "after a thorough review of the case, even a successor judge may exercise a significant discretion to grant a new trial on the general grounds." (Citation omitted.) *Hyden v. State*, 308 Ga. 218, 226 (3) (d) (839 SE2d 506) (2020). Finally, even though the record shows that the trial court did not specifically address Caviston's general grounds argument in his order denying the

motion for a new trial,

> it is well established that this Court must presume that the trial judge knew the rule as to the necessity of exercising his discretion, and that he did exercise it. [This Court] cannot assume, in the absence of positive evidence to the contrary, that the judge knowingly declined to exercise his discretion. Thus, where a trial judge ruling on a new trial motion enters an order that, without more, recites that the new trial is refused or denied, this will be taken to mean that the judge has in the exercise of his discretion approved the verdict.

(Citations and punctuation omitted.) *Butts v. State*, 297 Ga. 766, 772 (3) (778 SE2d 205) (2015).

The successor judge who heard the motion for a new trial summarily denied Caviston's motion for a new trial based upon "consideration of all the pleadings, briefs, arguments of Counsel and evidence presented[.]" There is no indication in the court's order or in the transcript of the hearing on Caviston's motion that the judge failed to exercise his discretion as required or applied an inappropriate standard of review. Under these circumstances, Caviston has not shown that the trial court erred in denying his motion on the general grounds alleged. See *Butts*, 297 Ga. at 772 (3).

11

2. Caviston contends that the trial court abused its discretion in admitting evidence pursuant to OCGA § 24-4-404 (b) that he had written a book in 2005, titled "The Philosophy of Murder," about a serial killer stalking actresses in Hollywood. He argues that the evidence was unduly prejudicial and that his conviction must be set aside. For the following reasons, we disagree.

The record shows that, prior to trial, the prosecutor notified the trial court and defense counsel that the State intended to introduce evidence of the novel at trial. Caviston objected, arguing that the novel was not relevant to any material issue and would serve only to inflame the jury. After the prosecutor argued theories under which the book and its contents might be admissible, the trial court reserved ruling and directed the parties to approach the bench before attempting to introduce any evidence concerning the book at trial.

During trial, after Caviston testified that his mother's death was an accident, the State cross-examined him on whether he had written any books between 2004 and 2005, and defense counsel

12

objected. The trial court then conducted a hearing outside the presence of the jury. During the hearing, the prosecution argued that evidence of the novel was relevant to Caviston's mental state. Caviston responded that the book was a work of fiction, was authored nine years prior to Agnes Caviston's death, and was irrelevant to any issue at trial. Caviston also argued that the title was "so prejudicial that it may sway jurors' minds just because he wrote a book called 'The Philosophy of Murder,'" noting that there had been no testimony opening the door to any cross-examination concerning the book, such as whether Caviston had worked as a writer. The Court ruled that the prosecutor could ask Caviston about the book.

After the jury returned to the courtroom, and over Caviston's objection, the prosecutor asked Caviston whether he had written a book entitled "The Philosophy of Murder" in 2005, and he answered "yes." Caviston explained that it was a romance novel, and that the serial killer portion of the plot was a device to put pressure on the protagonists, "to see where they could go in a stressful situation."

After trial, the trial court entered a written order memorializing its ruling on this evidentiary issue. The trial court found that Caviston had placed his character in issue by testifying; that he testified to the affirmative defense of accident on direct examination; that the State had the burden of disproving beyond a reasonable doubt the affirmative defense of accident; that Caviston's having written a book called "The Philosophy of Murder" was relevant to the issue of intent; and that the probative value of allowing the jury to hear that Caviston wrote a book called "The Philosophy of Murder" outweighed any prejudicial effect.

Under OCGA § 24-4-401, "relevant evidence" is evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under OCGA § 24-4-402, "[a]ll relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or other rules. . . . Evidence which is not relevant shall not be admissible." OCGA § 24-4-403 ("Rule 403") provides that "[r]elevant

14

evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

This Court has held that "[t]he application of the Rule 403 test is a matter committed principally to the discretion of the trial courts," and "the exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly. The major function of Rule 403 is to exclude matter[s] of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Flowers v. State*, 307 Ga. 618, 622-23 (837 SE2d 824) (2020). This Court reviews a trial court's ruling on an evidentiary issue for abuse of discretion. *Middlebrooks v. State*, 310 Ga. 748, 750 (854 SE2d 503) (2021).

Even if a trial court abuses its discretion in admitting certain evidence, such non-constitutional error is deemed harmless and does not require reversal if it is highly probable that the error did not contribute to the verdict. See *Heard v. State*, 309 Ga. 76, 90 (844

15

SE2d 791) (2020). To determine if an error was harmless, this Court reviews the record de novo and weighs the evidence as it would expect reasonable jurors to have done as opposed to viewing the evidence in the light most favorable to the jury's verdict. Id. This Court has

> held that evidence that was (or was assumed to have been) improperly admitted . . . was harmless in cases where the properly admitted evidence proving that the appellant committed the charged crimes was so strong that the prejudicial effect of the [improperly admitted] evidence had no significant influence on the guilty verdict. . . .The improperly admitted . . . evidence in many such cases was not especially prejudicial, for example because the [improperly admitted evidence] was relatively benign[.]

Id. at 91.

Assuming, without deciding, that the trial court abused its discretion in admitting evidence about Caviston's novel, it is highly probable that the evidence did not contribute to the verdicts given Caviston's explanation of the plot and the very short time devoted to this line of questioning during cross-examination. The State asked a total of three questions related to the novel, and the only

evidence placed before the jury was that Caviston wrote "The Philosophy of Murder," a romance novel with a serial-killer subplot that was published in 2005. The novel itself was not introduced. In contrast, the State presented an overwhelming amount of evidence unrelated to the novel on the issue of Caviston's guilt. For example, 18 witnesses testified for the State, many of whom recounted Smith's admissions that he killed his mother. Others gave expert testimony explaining either how the fire was intentionally set or how repeated and intense blunt force inconsistent with an accidental fall was necessary to cause the victim's severe injuries. Any undue prejudice from admitting evidence about the novel was offset by the overwhelming evidence of Caviston's guilt and the improbability of his accident defense. Consequently, it is highly probable that the evidence did not contribute to the verdicts. See *Heard,* 309 Ga. at 90-91.

*Judgment affirmed. All the Justices concur.*