315 Ga. 536
FINAL COPY

S22A0970. McCOY v. THE STATE.

LaGrua, Justice.

Appellant Thomas McCoy was convicted of felony murder and other crimes in connection with the attempted burglary and shooting death of Theodore Barber, as well as theft by receiving of Tony Smith's SUV.[1] On appeal, Appellant contends in his sole

---

[1] The crimes occurred on December 2, 2003. On February 17, 2004, Appellant and co-defendant Michael Favors were indicted by a Fulton County grand jury for malice murder (Count 1), felony murder based on aggravated assault (Count 2), felony murder based on burglary (Count 3), aggravated assault with a deadly weapon (Count 4), burglary (count five), theft by receiving stolen property (Count 6), and two counts of possession of a firearm during the commission of a felony (Counts 7 and 8). Favors was also indicted for aggravated assault on a peace officer. Appellant and Favors were jointly tried in October 2005 and convicted on all counts. In October 2009, Appellant and Favors moved for a new trial, which the trial court granted. The new trial took place from April 23 through 27, 2012, and the jury found Appellant and Favors guilty on all counts. Appellant and Favors filed timely motions for new trial. After an evidentiary hearing, the trial court denied the motions, and Appellant and Favors filed timely notices of appeal. In March 2015, this Court issued an opinion in Favors's direct appeal, see *Favors v. State*, 296 Ga. 842 (770 SE2d 855) (2015), affirming in part and vacating in part the judgment below and remanding for re-sentencing due to merger errors. Following the issuance of that opinion, on November 2, 2015, the trial court, which had originally sentenced Appellant to serve life in prison, plus a consecutive five years, re-sentenced Appellant to serve life in prison for malice murder (Count

enumeration of error that the evidence was legally insufficient to support his convictions. For the reasons explained below, we see no error and affirm.

Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that, on December 2, 2003, Barber called 911 at 11:43 a.m. to report that he believed someone was about to break into his apartment. On the 911 recording, Barber stated that two young men were "banging" on doors and trying to break into apartments in his building. He also stated that the men arrived in a "burgundy Ford Explorer." Barber explained to the 911 operator that he was armed and prepared to defend himself. The 911 operator

1), ten years for burglary (Count 5) to run concurrently with count 1, five years for theft by receiving stolen property (Count 6) to run consecutively to Count 1, and five years on probation for each count of firearm possession (Counts 7 and 8). Due to the trial court's delay in completing the record, Appellant's appeal was not docketed in this Court until August 30, 2017. On October 3, 2017, noting that Appellant had failed to file a brief in this case, the Court issued an order directing Appellant's counsel to file a brief on Appellant's behalf by October 13, 2017. On December 11, 2017, having yet to receive a filing from Appellant, this Court struck the case from the docket and remanded it to the trial court to determine "whether Appellant's failure to file a timely appellate brief was the result of his counsel's ineffective assistance and, if so, whether new counsel should be appointed to represent Appellant." On May 8, 2018, Appellant's new counsel entered an appearance. On March 30, 2022, the trial court ordered the Fulton County clerk to transmit the record to this Court, and the appeal was re-docketed to this Court's August 2022 term.

attempted to calm Barber down and informed him that she had dispatched units to his location. Within moments, Barber told the 911 operator that the men were "kicking the door in," and loud thuds could be heard on the 911 recording before gunshots were fired. The 911 operator then called out to Barber, who did not respond.

In response to Barber's 911 call, Officer Heather Davis of the Fulton County Police Department was dispatched to Barber's location. Officer Davis parked her patrol vehicle, and as she began to approach the apartment building on foot, she heard "tires squealing" and saw a burgundy Ford Expedition SUV backing out of a parking spot. The driver of the SUV drove toward the apartment complex exit, near where Officer Davis was standing. She tried to stop the SUV, but the driver swerved the car toward her, causing her to jump out of the way. Officer Vernal Sutherland was also dispatched to the scene and arrived just in time to see the SUV "barrel[ling] out" of the complex. Officer Sutherland pursued the SUV until the driver "bailed out" of the moving vehicle and fled on foot. Officer Sutherland gave chase, caught the driver, and placed

him under arrest. The driver of the SUV was later identified as Appellant's co-defendant, Michael Favors.

While Officer Sutherland chased Favors on foot, Officer Davis returned to the apartment building and located the specific apartment from which the 911 call originated. She noticed that the door had been kicked in and the doorframe had been broken. Once inside the apartment, she observed a man — later identified as Barber — lying on the floor, bleeding and unresponsive. The medical examiner determined that Barber died from a gunshot wound to the chest. A bullet was extracted from Barber's chest, which was confirmed by the ballistics expert to be a .38-caliber bullet. A .40-caliber bullet and shell casing were also found at the scene, indicating that two separate guns were fired in Barber's home.[2] The ballistics expert concluded that the .38-caliber bullet that caused Barber's death was fired from a revolver, whereas the .40-caliber shell casing and bullet were fired by a Glock handgun.

---

[2] Neither the .38-caliber murder weapon nor the .40-caliber gun was ever found. At the scene, detectives discovered a 16-gauge shotgun lying next to Barber's body that had not been fired.

A detective impounded the burgundy SUV and, after running an impound report, determined that the vehicle had been reported stolen. Detectives obtained a search warrant for the vehicle and dusted for fingerprints. Testimony from crime scene technicians at trial revealed that latent fingerprints found on the passenger side of the SUV matched Favors's fingerprints, and a latent fingerprint pulled from a candy bar wrapper found under the driver's seat of the SUV matched the known prints of Appellant.

Smith, the owner of the stolen SUV, testified that, on November 30, 2003 — two days before Barber was killed — two men approached him with guns drawn while he was pumping gas and stole his 1996 burgundy Ford Expedition and his cell phone. Smith testified that, after his SUV and phone were taken from him, he changed the greeting on his cell phone voicemail so that anyone who tried to call him would know that the phone had been stolen.

At trial, 14-year-old Taja Glenn — who was dating Appellant — and 16-year-old Lakeesha Reese testified that, a day or two before the shooting on December 2, Appellant and Favors picked up the

5

girls from Glenn's house in a burgundy SUV. Glenn testified that Appellant told her that he and Favors had stolen the SUV, and Reese testified that she found a cell phone in the back seat of the SUV and listened to the outgoing voicemail greeting, which "indicate[d] that the [SUV] had been stolen." Both girls testified that Appellant and Favors took them to a hotel room, where they watched television and played video games. Reese remembered seeing two guns "l[y]ing around" the hotel room, and Glenn testified that she saw both Favors and Appellant with guns. Glenn specifically remembered that Appellant's gun was a silver "cowboy" gun that "had a pullout where you put the bullets in" and that Favors's gun was black. Glenn also testified that she overheard a conversation between Appellant and Favors that "they were going to go hit a lick," which she knew was slang for robbing someone, and that "the person was not supposed to be there." Reese testified that she did not hear anyone talk about "hit[ting] a lick."

Appellant told Glenn that, if for some reason he and Favors were not at the hotel the next morning, the girls should pack up the

6

PlayStation, and Appellant's mother would come pick them up. When the girls woke up the next morning, Favors and Appellant were not in the hotel room, and Glenn believed they left the hotel in the burgundy SUV. Appellant's mother picked up the girls from the hotel and took them to a MARTA train station. Glenn testified that, at some point after Appellant's mother picked them up, Appellant called her and said that "the lick went bad," "the man was home," "the man had a gun," and "the man was shot."

For reasons not established by the record, on the evening of December 2, Glenn and Reese were taken by their mothers to the DeKalb County Police Department. Detective Wade Yates — the lead detective with the Fulton County Police Department investigating Barber's death — was notified by the DeKalb County Police Department that the girls had information potentially related to his investigation. Detective Yates then requested that Detective Orlando Concepción, with the DeKalb County Police Department,

7

record interviews with the two girls.[3] Detective Yates obtained a warrant for Appellant's arrest, and on or around December 4, Appellant turned himself in to the Fulton County Police Department.

Appellant contends that the evidence presented at trial was insufficient to support his convictions. Specifically, Appellant argues that (a) the testimony of Joseph Sager, a crime scene technician, was based on hearsay and cannot support Appellant's convictions and (b) the evidence was insufficient to convict him as a party to the crime under OCGA § 16-2-20.

> When evaluating the sufficiency of evidence as a matter of constitutional due process, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. This Court views the evidence in the light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence.

*Sams v. State*, 314 Ga. 306, 309 (2) (875 SE2d 757) (2022) (citation and punctuation omitted) (citing *Jackson v. Virginia*, 443 U.S. 307,

---

[3] Portions of Reese's and Glenn's statements were admitted at trial for impeachment purposes.

319 (99 SCt 2781, 61 LE2d 560) (1979)).

(a) Appellant contends that the testimony of Sager, the crime scene technician who identified Appellant's fingerprint on the candy wrapper in the SUV, was "non-probative hearsay" and cannot be considered in determining the sufficiency of evidence.[4]  This claim has no merit.

At trial, Sager testified that he was a senior crime scene technician for nine years and his duties included identifying latent prints, lifting latent prints, and comparing latent prints to known prints. The State moved to qualify Sager as "an expert in the area of latent print identification." Appellant's trial counsel did not object, and Sager was so qualified. Sager testified that he processed the candy bar wrapper that had been found in the burgundy SUV and lifted a latent fingerprint. After entering Appellant's fingerprint card into evidence without objection, the prosecutor asked, "Did you have

---

[4] Under Georgia's old Evidence Code, which applies in this case because Appellant was tried in 2012, "'erroneously-admitted hearsay' was deemed to have no probative value and therefore could not be considered in determining the sufficiency of the evidence." *Dawson v. State*, 308 Ga. 613, 616 (2) (842 SE2d 875) (2020) (citation omitted).

the opportunity to compare the known print of [Appellant] to . . . the latent print of value that you located on the . . . candy bar wrapper?" Sager responded, "Yes, I did." The prosecutor then asked, "Can you tell us what your results were?" Sager responded, "The results were that — after comparison, that it was determined that the print matched the right middle finger of the card."

Appellant argues that Sager's qualification as an expert in the area of latent print identification, instead of latent print identification and comparison, as well as his use of the "third person" in stating "it was determined that the print matched" compels this Court to conclude that Sager's testimony was non-probative hearsay. This argument is unavailing. A careful review of Sager's testimony reveals that his testimony was not based on hearsay, but on his personal knowledge, as evidenced by Sager's responses to the questions inquiring into his personal involvement with the case (e.g., "Can you tell us what *your* results were?") (emphasis supplied). Consequently, his testimony does not fall within the definition of hearsay that was applicable at the time of

10

Appellant's trial. See former OCGA § 24-3-1 (a) ("Hearsay evidence is that *which does not derive its value solely from the credit of the witness* but rests mainly on the veracity and competency of other persons.") (emphasis supplied). See also *Bell v. State*, 294 Ga. 443 (754 SE2d 327) (2014) (holding that a witness's testimony based on a fact within his personal knowledge was not hearsay). Thus, Sager's testimony was not "non-probative hearsay" and can be considered in determining the sufficiency of the evidence.

(b) Appellant also contends that the evidence was insufficient to convict him as a party to the crime under OCGA § 16-2-20 for the following reasons: (1) the evidence supporting the jury's verdicts primarily came from the conflicting testimony of Reese and Glenn — e.g., Glenn testified that she overheard Appellant and Favors talking to each other about "hit[ting] a lick," but Reese testified that she never heard any such conversation; (2) his convictions were based wholly on circumstantial evidence, citing *Clyde v. State*, 276 Ga. 839, 840 (584 SE2d 253) (2003) (since there was "no testimony" that the defendant intended the alleged crimes, "[a]ll of the State's evidence

11

against [defendant] was circumstantial, which requires that the proved facts shall exclude every other reasonable hypothesis save that of the guilt of the accused"); and (3) the State did not rule out the possibility that Favors acted alone or that Appellant attempted to dissuade Favors from "hit[ting] a lick." We see no merit in these contentions.

A person is a party to a crime if, among other things, he "[d]irectly commits the crime," "[i]ntentionally aids or abets in [its] commission," or "[i]ntentionally advises, encourages, hires, counsels or procures another" to commit it. OCGA § 16-2-20 (b). Although "mere presence at the scene of a crime is not sufficient evidence to convict one of being party to a crime," a jury is entitled to infer criminal intent from a defendant's "presence, companionship, and conduct before, during, and after the offense." *Jones v. State*, 314 Ga. 214, 231-232 (3) (875 SE2d 737) (2022) (citation and punctuation omitted).

Here, there was sufficient evidence for a jury to conclude that Appellant committed the crimes at issue. The evidence showed that

12

Appellant and Favors were driving around in a stolen SUV two days before the murder and that they picked up Glenn and Reese in that same SUV. Appellant's fingerprints were also discovered in the stolen SUV on a candy bar wrapper. Appellant and Favors disappeared from the hotel room where they were staying with Glenn and Reese after discussing their plans to "hit a lick." Glenn testified that she saw Appellant with a silver "cowboy" gun and Favors with a black gun. Two guns were fired at the scene of Barber's death, including the gun that killed Barber. Appellant told Glenn that he and Favors might not return to the hotel once they had left, gave instructions for them to pack up their belongings, and told Glenn and Reese that, if they did not return, his mother would pick the girls up from the hotel the following day. Appellant then left and did not return the following day, which was the day Barber was killed.

Additionally, while Barber was on the phone with the 911 operator moments before his death, he explained that two young men were attempting to break into his home. Favors was apprehended by

13

law enforcement officers after fleeing the apartment complex where the shooting occurred in an SUV that matched the description of the SUV Barber gave to the 911 operator. And, mere hours after the shooting, Appellant told Glenn that "the lick went bad," "the man was home," "the man had a gun" and, "the man was shot."

Accordingly, the evidence was sufficient as a matter of constitutional due process to authorize the jury to conclude that Appellant and Favors committed the crimes together and to convict Appellant on the basis of his "presence, companionship, and conduct" with Favors "before, during, and after the offense." *Jones*, 314 Ga. at 232 (3) (citation and punctuation omitted).

Further, a conviction can rest on circumstantial evidence alone if that evidence "exclude[s] every other reasonable hypothesis save that of the guilt of the accused," OCGA § 24-14-6, but "the evidence need not exclude every conceivable inference or hypothesis — only those that are reasonable." *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019) (citation, punctuation and emphasis omitted). The question as to "whether any alternative hypotheses are reasonable

14

and whether the circumstantial evidence excludes any such hypotheses" is for the jury to resolve. *Willis v. State*, 315 Ga. 19, 24 (2) (880 SE2d 158) (2022).

Even assuming that all of the evidence presented at trial was circumstantial, the evidence was sufficient as a matter of Georgia statutory law for a jury to convict Appellant. And "where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused," as they did here, "we will not disturb that finding unless it is insupportable as a matter of law." *Graves*, 306 Ga. at 487 (1) (citation and punctuation omitted). Despite Appellant's protests regarding the inconsistency of Reese's and Glenn's testimony, "it is axiomatic that resolving evidentiary conflicts and assessing witness credibility are within the exclusive province of the jury." *Graves v. State*, 298 Ga. 551, 553 (1) (783 SE2d 891) (2016). See also *Carter v. State*, 314 Ga. 317, 319-320 (2) (a) (877 SE2d 170) (2022) (holding that the evidence was sufficient to support defendant's guilt where the testimony of two witnesses

15

conflicted about the defendant's whereabouts on the day of the murder, noting that "[t]o the extent that [one witness's] testimony conflicts with [another's], that inconsistency was for the jury to resolve, and the jury was entitled to disbelieve" either witness's version of the events). Moreover, Glenn's testimony relaying Appellant's statements to her about the crimes (e.g., how he and Favors stole the SUV and what occurred when "the lick went bad") was sufficient for the jury to find Appellant guilty of the crimes charged. See OCGA § 24-14-8 ("The testimony of a single witness is generally sufficient to establish a fact."). Accordingly, Appellant's claim fails.

*Judgment affirmed. All the Justices concur.*

16

Decided February 7, 2023.

Murder. Fulton Superior Court. Before Judge McBurney.

*Mark A. Yurachek*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Ruth M. Pawlak, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.