316 Ga. 241
FINAL COPY

S23A0379.  PERRAULT v. THE STATE.

MCMILLIAN, Justice.

In February 2022, a jury found Michael Seth Perrault guilty of malice murder and simple battery, family violence of his wife, Amanda Perrault.[1] On appeal, Perrault asserts that (1) the evidence was not sufficient to support his convictions; (2) the trial court erred in refusing to transfer the case to a different venue; and (3) he is entitled to a new trial due to cumulative error. For the reasons that follow, we affirm.

---

[1] Amanda was killed on or about February 3, 2020. On November 3, 2020, a Putnam County grand jury indicted Perrault for malice murder (Count 1), felony murder (Count 2), aggravated assault, family violence (Count 3), and simple battery, family violence (Count 4). At a trial in February 2022, a jury found Perrault guilty of all counts. The trial court sentenced Perrault to serve life in prison without the possibility of parole on Count 1 and 12 months in prison on Count 4, to be served concurrently with Count 1; the remaining counts were either vacated by operation of law or merged for sentencing purposes. Perrault timely filed a motion for new trial, which he amended through new counsel on August 26, 2022. Following a hearing, the trial court denied the motion for new trial on September 2, 2022. Perrault timely appealed, and the case was docketed to the term of this Court beginning in December 2022 and submitted for a decision on the briefs.

Viewed in the light most favorable to the jury's verdict, the evidence presented at trial showed that on January 28, 2020, Amanda went to a neighbor's house and called the Putnam County Sheriff's Office to report that Perrault had committed an act of domestic violence against her. At the time, Perrault himself was a police officer with the Eatonton Police Department. Amanda told the responding officer that she had been scared to call the police because of her husband's job, but Perrault had woken her up from a nap, called her a "whore," and held her up against a wall and choked her.

Perrault's eight-year-old daughter, B. P., told the responding officer that when she got home from school, her father and Amanda were arguing, so she hid in her closet. She eventually came out to see what was going on and heard Amanda say, "[J]ust let me get my purse and I'll leave." Then she saw her father push Amanda out the front door. While the officer spoke with B. P. inside, he had allowed Perrault to retrieve his ID from his car. When the officer went back outside to speak with Amanda again, he noticed that the garage door had been opened and that Amanda appeared more upset. Amanda

2

stated that Perrault had opened the garage door and told her, "I got you now."

Although Perrault initially denied that there had been a physical altercation, he later said he had to push Amanda out the front door because she would not leave. He later claimed that he had to push her because she was hitting him and then stated that he had to push her because she was damaging property inside the house. Although the responding officer photographed red marks on Amanda's chest, he did not observe any injuries on Perrault or any apparent damage in the home. Perrault was placed under arrest that evening for simple battery and later placed on administrative leave from the Eatonton Police Department.

Six days later, at 1:10 p.m. on February 3, 2020, Putnam County Sheriff's Deputy Terrell Abernathy went to the Perrault home to serve a witness subpoena on Perrault for an unrelated matter. Deputy Abernathy rang the doorbell, which included a camera facing the front step, several times and heard heavy footsteps moving hurriedly inside the home. However, no one came

to the door, and he eventually left around 1:17 p.m. Perrault's security system showed the front door being opened at 1:24 p.m. Deputy Abernathy was dispatched back to the Perrault home at 1:36 p.m. regarding a possible suicide after Perrault called the Eatonton Police Chief, crying hysterically that his wife had killed herself.

When Deputy Abernathy arrived back at the house, Perrault was sitting on the front steps, crying and wearing gym shorts and a t-shirt. Both at the scene and on the ride to the Sheriff's Office, Perrault made several spontaneous statements, including that "he did not care if he spent the rest of his life in prison," that "his life was over," that it was "all his fault," and that "his wife was trying to clear his name, but could not handle the stress of the media." He also made statements that he had witnessed his wife "execute herself."

Inside the Perrault home, officers found Amanda deceased in her bed from what appeared to be a close contact gunshot wound to the right side of her head. She was lying on her back with her hands down by her side in a cupped position. A .380 Smith & Wesson pistol

was located near the left side of Amanda's feet near the footboard with a cartridge loaded in the firearm. The magazine had been removed from the pistol and was located near Amanda's right thigh. Two cartridges were found in the bedding near the footboard, and a spent shell casing was found near the bedroom door, approximately 17 feet away from where Amanda was found in the bed. Officers observed several empty bottles of Fireball whiskey on the nightstand and in a black plastic bag on the bedroom floor. Officers also located a damp towel on the closet floor and observed that Perrault smelled of soap.

When Perrault was led to Sheriff Howard Sills's office, he abruptly stopped crying for the first time. Perrault agreed to speak with Sheriff Sills about what had happened to Amanda that day; however, Perrault continuously returned to the January 28 incident, claiming that Amanda was a "liar" and that the deputies who arrested him had overreacted. His only explanation of what had happened to Amanda was that they had been lying in bed having a casual conversation when Amanda abruptly produced a gun, said, "I

can't do this," and shot herself. He claimed that she was distraught over what she had done to Perrault and his reputation after he was arrested. Perrault denied ever touching the pistol that day and initially denied touching Amanda after she shot herself, but later said, "I might have hugged the sh*t out of her. I could have touched her." He had no explanation for why the magazine was out of the pistol when officers arrived. A gunshot residue test revealed that Perrault had one particle of gunshot primer residue on his left hand.[2] An audio recording of this interview was played for the jury.

The GBI was called to assist in the investigation, and based on the blood evidence at the scene, Special Agent Brian Hargrove determined that Amanda was in a seated upright position in her bed when she sustained the gunshot wound to the right side of her head. The majority of the blood evidence was located on the west side wall of the bedroom; however, Amanda's blood was also found in a separate location across the house on the door-jamb to the guest bathroom. There was no blood on either of Amanda's hands or on the

---

[2] Amanda's hands were not tested for gunshot residue.

sleeves of the shirt Amanda was wearing.

Officers later determined that Perrault lied about his whereabouts in the hours leading up to Amanda's death. Although he claimed that he and Amanda dropped B. P. off at school and then went to a gas station on Highway 16, this was disproved by surveillance footage from another convenience store that captured Perrault entering the store wearing a Costa hat, a Pink Floyd t-shirt, and jogging pants. He left the store at 10:16 a.m. and got into the front passenger side of his truck, which was being driven by Amanda. The shirt and pants Perrault was wearing at that time were later located in the washing machine at Perrault's home.

A jailhouse informant told officers that Perrault laughed about how the officers had "f*cked up [their] own crime scene" and showed him the way he pulled back Amanda's arm to pull the trigger while she was passed out. Perrault also told him that they had gone to the store to get more Fireball and that his biggest concern was that he had been caught on camera with the clothing that was found in the washing machine and that, if he had known that, he would have

7

done things differently.

At trial, the State called several witnesses who had observed Perrault's prior behavior toward Amanda. The Perraults' next-door neighbor, Dawn Anderson, testified that she had overheard Perrault and Amanda have terrible, verbally abusive fights. One time she saw Amanda running up the hill toward her house while Perrault was grabbing her hair. When he let her go, Amanda fell to the ground, and Perrault then kicked her in the back and on her side. On another occasion, Anderson saw Perrault holding Amanda's hair while she was running out of the garage. Anderson also testified that Amanda came to her home one day, crying and saying that Perrault had said he was going to kill her. Amanda told her that if she were ever found dead, Anderson should make sure the police knew that she did not kill herself. On the evening of January 28, 2020, Amanda ran into Anderson's house looking for a telephone. When Amanda found Anderson's phone, she immediately called 911. Anderson saw red marks on Amanda's chest.

Another neighbor, Lula Connally, testified that she had heard

Perrault and Amanda arguing many times, including on the day that Amanda was shot. Yet another neighbor, Karen Dorton, testified that whenever Perrault was home, she could hear him "raging." At times Dorton considered calling the police, but she was intimidated because she knew that Perrault was a police officer.

One of Amanda's sisters testified that Perrault was "very demeaning" to Amanda. Amanda once told her that she had locked herself in a bedroom and put a heavy dresser in front of it after Perrault became drunk and belligerent, but Perrault kicked the door in, knocked over the dresser, and spit on her. In January 2019, Amanda sent her sister messages that Perrault had choked and kicked her and destroyed her electronic tablet. In June 2019, Amanda sent her a picture of injuries she had on her face.

Amanda's other sister also testified about Perrault's treatment of Amanda. In October 2018, Amanda told her that Perrault had grabbed her by the hair, thrown her to the floor, and choked her. In July 2019, Amanda said that Perrault had tried to choke her and had punched her in the side of the face. Amanda's adult daughter

9

testified that she had lived with Amanda and Perrault at one point and saw Perrault verbally and physically abuse Amanda. In June 2018, Amanda told her that Perrault had once choked her until she almost passed out, pulled her off the bed by her hair, and "busted her lip." Amanda sent her pictures showing the injuries from that incident.

B. P. testified that she had witnessed her father "shove" Amanda on January 28, 2020. A recording of B. P.'s forensic interview conducted shortly after Amanda's death was also played for the jury. During that interview, B. P. said that her father apologized to her after his January 28 arrest and asked her not to say anything about what he had done. B. P. also said that Amanda had told her that if her "real" mom found out what had happened and her father lost custody of her, he would "come shoot [Amanda] dead."

The State also introduced video evidence from Amanda's cell phone, including a video showing Perrault screaming at Amanda while they were in their bedroom and a video of Amanda emotionally

10

describing the abuse she had recently experienced. Her phone records showed that the morning of her death, she called the EBT office in Georgia at 8:40 a.m. and that she was searching for homes for sale throughout Putnam County the day before her death.

The medical examiner testified that she "felt that the most compelling [conclusion in her] professional judgment was that [the] manner [of death] was suicide," but she could not say which specific findings she relied upon to make that determination. She could not recall whether she knew that agents later recovered two unfired bullets in the bedding and Perrault's clothing in the washing machine, that Perrault had allegedly told Amanda on January 28, "I got you now," that gunshot residue was found on Perrault's hand, or that Perrault told B. P. not to say anything about what had happened on January 28. She agreed that Amanda would have been immediately incapacitated upon receiving the injury to her head and would not have been able to pull the magazine out of the gun.

Amanda's blood alcohol content level was 0.230. The toxicology panel was negative for illegal drugs, but it did not screen for all

11

prescription medications. The jailhouse informant also told officers that Perrault had given Amanda "painkillers" all day, that she was drinking Fireball, and that she had passed out. Officers found a pill bottle in Perrault's safe in the master closet that contained several Tylenol Three pills and one Flexeril, a prescription muscle relaxer.

1. Perrault first asserts that the evidence was not sufficient to support his conviction beyond a reasonable doubt as a matter of Georgia statutory law because it did not exclude every reasonable theory other than guilt. We are not persuaded.

Under Georgia's statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. "[A]nd where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law." *Smith v. State*, 315 Ga. 357, 358 (1) (882 SE2d 289) (2022) (citation and

punctuation omitted).

Here, Perrault contends that the evidence did not eliminate the alternative hypothesis that Amanda committed suicide. But the evidence was more than enough for the jury to reject that hypothesis as unreasonable. The evidence showed that Perrault was angry at Amanda following his January 28 arrest and that his job and custody of B. P. were in jeopardy. Family and neighbors detailed multiple instances of prior abuse Perrault had inflicted on Amanda, as well as her expressly stated concern that he would one day kill her. The forensic evidence also showed that Amanda's blood was found across the house and her hands were cupped and positioned down by her side while the magazine was out of the gun and placed on the opposite side of her body from the gun. In addition, Perrault lied about his whereabouts the morning of the shooting, and the clothing he was wearing was found in the washing machine, a concern Perrault conveyed to the jailhouse informant, along with other incriminating information.

Although Perrault points to certain inconsistencies in the

evidence, including the medical examiner's conclusion and the lack of gunshot residue testing on Amanda's hands, "it is axiomatic that resolving evidentiary conflicts and assessing witness credibility are within the exclusive province of the jury." *Graves v. State*, 298 Ga. 551, 553 (1) (783 SE2d 891) (2016). And it is the jury's role to determine "[w]hether an alternative hypothesis raised by the defendant is 'reasonable.'" *Smith*, 315 Ga. at 358 (1). See also *McCoy v. State*, 315 Ga. 536, 542-43 (b) (883 SE2d 740) (2023) (even assuming all of the evidence was circumstantial, it was sufficient as a matter of Georgia statutory law); *Adkins v. State*, 314 Ga. 477, 482 (2) (877 SE2d 582) (2022) (jury was free to reject as unreasonable defendant's theory that the victim committed suicide). The evidence presented at trial was sufficient to authorize the jury to reject Perrault's theory that Amanda had killed herself and instead find Perrault guilty of the crimes of which he was convicted beyond a reasonable doubt.[3] Accordingly, this enumeration of error fails.

---

[3] To the extent Perrault also challenges the sufficiency of the evidence as a matter of constitutional due process, we conclude that the evidence presented

2. Perrault next asserts that the trial court erred in refusing to transfer this case to a different venue. This claim is without merit. Although Perrault filed a motion to change venue in November 2020, he expressly withdrew that motion during a pretrial hearing in February 2022 before the trial court made any ruling on the motion. Accordingly, there is nothing for this Court to review, and this enumeration of error fails.[4]

3. In his final enumeration of error, Perrault argues that he is

---

at trial was sufficient to allow a rational jury to find beyond a reasonable doubt that Perrault was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (when reviewing the sufficiency of the evidence as a matter of constitutional due process, we view the evidence in the light most favorable to the jury's verdict to determine whether a rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt). To the extent that Perrault also asks this Court to review the trial court's determination on the general grounds, that argument is not properly addressed to this Court and necessarily fails. See *Caviston v. State*, 315 Ga. 279, 286 (2) (882 SE2d 221) (2022).

[4] Perrault argues in passing that his trial counsel's withdrawal of the motion to change venue constitutes ineffective assistance of counsel. However, because this claim was raised for the first time in his reply brief on appeal, Perrault has forfeited an ineffective assistance claim on this ground. See *Patterson v. State*, 314 Ga. 167, 171 (2) (a) (875 SE2d 771) (2022) ("Ineffectiveness claims must be raised and pursued at the earliest practicable moment, which for a claim of ineffective assistance of trial counsel is at the motion for new trial stage if the defendant is no longer represented by the attorney who represented him at trial.").

15

entitled to a new trial due to the cumulative effect of several evidentiary and other types of errors and the ineffective assistance of trial counsel. Although Perrault has not separately enumerated these errors, he identifies the following: (a) law enforcement failed to maintain the chain of custody of the firearm; (b) the presence of Sheriff Sills at the prosecution table during trial violated the rule of sequestration; (c) the trial judge improperly referred to Sheriff Sills as a prosecutor; (d) the prosecutor referred to Perrault as a murderer "during the trial"; and (e) his trial counsel was ineffective in failing to call unidentified "key witnesses" to testify.[5] We are not persuaded that Perrault has shown that he is entitled to a new trial on this basis.

To establish cumulative error, Perrault must show that "at least two errors were committed in the course of the trial and considered together along with the entire record, the multiple errors

---

[5] Without naming the witness, Perrault asserts: "This witness would have shown that the January 28, 2020[ ] incident was truly a misunderstanding, and there was no physical confrontation." Perrault does not attempt to describe the anticipated testimony of the other "key witnesses" who he claims should have been called to testify.

so infected the jury's deliberation that they denied [him] a fundamentally fair trial." *Huff v. State*, 315 Ga. 558, 567-68 (6) (883 SE2d 773) (2023) (citation and punctuation omitted). Perrault failed to carry this burden. Not only has he failed to separately enumerate the underlying errors he claims should cumulatively result in a new trial, he has largely failed to specify where in the record the alleged errors occurred, whether these claims were preserved for appellate review,[6] or in what way this Court should aggregate the combination of evidentiary and non-evidentiary errors alleged. See *Jones v. State*, 314 Ga. 605, 617 (5) n.9 (878 SE2d 505) (2022) (cautioning that if an appellant seeks a new trial based on cumulative errors outside of the evidentiary context, he would do well to explain why cumulative error should be so extended); *Willis v. State*, 304 Ga. 686, 696 (7) (d) (820 SE2d 640) (2018) (because the appellant provided no citation to

---

[6] For example, because Perrault did not object to the firearm's chain of custody at trial, this evidentiary claim is reviewed only for plain error. See OCGA § 24-1-103 (d). However, Perrault has not even attempted to satisfy any of the four prongs required to establish plain error. See *Griffin v. State*, 309 Ga. 860, 864 (2) (849 SE2d 191) (2020) (to establish plain error, appellant must point to error that (1) was not affirmatively waived; (2) was clear and not open to reasonable dispute; (3) affected his substantial rights; and (4) seriously affected the fairness, integrity or public reputation of judicial proceedings).

any evidence in the record to support his claim, and this Court could not readily identify its location, he failed to provide adequate argument and citation on appeal for this Court to conclude that the trial court erred). This Court is not required to cull the record to search for support for Perrault's claims, and we decline to do so here. See *Green v. State,* 300 Ga. 707, 712 (4) (797 SE2d 863) (2017) (declining to cull the record to review the merits of appellant's vague claims that there were "numerous matters" relating to trial counsel's performance). Accordingly, Perrault has failed to establish any error, much less cumulative error, and this enumeration fails. See *Heade v. State*, 312 Ga. 19, 29 (5) (860 SE2d 509) (2021) (appellant's cumulative error argument fails when there are no errors to cumulate); *Flood v. State*, 311 Ga. 800, 808-09 (2) (d) (860 SE2d 731) (2021) ("[W]hen reviewing a claim of cumulative prejudice, we evaluate only the effects of matters determined to be error[ rather than] the cumulative effect of non-errors." (citation and punctuation omitted)).

*Judgment affirmed. All the Justices concur.*

Decided May 2, 2023.

Murder. Putnam Superior Court. Before Judge Trammell.

*Brownstone P.A., Robert L. Sirianni, Jr., George W. Thomas*, for appellant.

*T. Wright Barksdale III, District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Chelsea S. Harvey, Assistant Attorney General*, for appellee.